## (September 9, 1968)

■ In the Matter of LELAND S. BECK, an Attorney, Respondent. HAROLD M. SPITZER, Petitioner. In the Matter of ANTHONY J. MELI, an Attorney, Respondent. HAROLD M. SPITZER, Petitioner. In the Matter of PETER S.

INGOGLIA, an Attorney, Respondent. HAROLD M. SPITZER, Petitioner. In the Matter of LAWRENCE S. INGOGLIA, an Attorney, Respondent. HAROLD M. SPITZER, Petitioner.— These are four separate proceedings to discipline the respective respondents, each an attorney, for professional misconduct. All proceedings stem from a certain land condemnation matter which had been pending in Nassau County. This court referred the disciplinary proceedings to a Justice of the Supreme Court for hearing and report. The Justice conducted a joint hearing of the four proceedings and has filed his report, finding (a) respondents Meli, Peter S. Ingoglia and Lawrence S. Ingoglia guilty of the charges, with certain stated exceptions, and (b) respondent Beck not guilty of the charges against him. Respondent Beck now moves to confirm the report as to him. Petitioner cross-moves to disaffirm the report as to Beck and moves separately for confirmation of the report as to the other respondents. Beck was admitted to practice on November 17, 1955 by the Appellate Division of the Supreme Court in the Third Department. The other respondents were admitted to practice by this court: Meli on February 4, 1943; Peter S. Ingoglia on November 6, 1929; and Lawrence S. Ingoglia on April 22, 1942. All of them have maintained offices in Nassau County. The record of the proceedings herein discloses the following history with respect to the transaction which constitutes the basis for all the charges: In October, 1962 Meli was appointed to the position of Principal Title Examiner in the office of the County Attorney of Nassau County. The problem of winding up Meli's private law practice was turned over by him to Beck, and Meli's name was placed on the door of Beck's law office. In January, 1963 Meli, in his new position in the County Attorney's office, dealt with a corporation, which was a claimant in a pending condemnation proceeding, in connection with a $90,000 offer which the claimant corporation had rejected. Although Meli had been instructed to make no offer higher than $90,000, the County Attorney's file revealed to Meli a confidential appraisal of $130,000 to $140,000 and notations to the effect that the county would settle the corporation's condemnation claim for up to $120,000. Meli told the two officers of the claimant corporation that they might do better if they had an attorney. Thereupon, he mentioned the respondent Peter Ingoglia. The officers replied that they knew his brother, Lawrence Ingoglia. Meli told them he knew Peter well but Lawrence only slightly. Shortly after this conversation, Peter Ingoglia arranged for Meli to speak with his brother Lawrence. Peter and Meli then went to Lawrence's office in Garden City. Meli advised Lawrence to solicit a retainer from the claimant corporation and at the same time disclosed to him the confidential figures from the County Attorney's file, which indicated that there was an appraisal considerably higher than the $90,000 offer and that the county would be willing to settle for any amount not exceeding $120,000. It was agreed that Meli would receive 50% of the fee paid by the claimant corporation to Lawrence. The corporation thereafter retained Lawrence. The condemnation claim was eventually settled for $122,000; and for his fee Lawrence received a separate check of $10,600 from the county. Meli and Lawrence discussed the manner in which Meli's portion of the fee should be paid over to him, some concern having arisen between them as to income tax liability and as to whether payment to Meli should be by a $5,000 check or $2,500 in cash. When Meli and Lawrence could not agree, Meli went to Peter Ingoglia and, after some discussion, Peter told Meli that Lawrence would give a $5,000 check to Meli's nominee. Meli thereupon requested that the check be made payable to Beck and delivered to Beck as Meli's nominee. On September 27, 1963 Beck, who upon the previous day had met Lawrence for the

922

first time, accepted from Lawrence a $5,000 check, dated September 26, 1963, payable to Beck. Endorsed upon the check was this legend: "Fee for consultation on * * * [the name of the claimant corporation] — Legal Services." Beck gave Lawrence his (Beck's) receipted bill for the check, dated September 27, 1963. This receipted bill was on the letterhead of Beck's law firm and stated: "For services rendered in connection with consultation Re: * * * [the name of the claimant corporation] — $5,000." Beck claimed that he did not then know that the check was in connection with a condemnation matter. However, he raised no question as to the endorsement on Lawrence's check indicating that it was for legal services rendered by Beck; he deposited the check into his (Beck's) law firm's bank account on or about September 30, 1963, and issued two of his own checks, each in the amount of $2,500 and dated October 2, 1963, payable to Meli. Thereafter, in November, 1963 Beck received from Lawrence a copy of a closing statement previously filed with the Judicial Conference which indicated that Beck had received part of the contingent fee from the claimant corporation in the condemnation matter. Beck thereupon demanded that his involvement be reversed or expunged. Accordingly, Meli went to Peter Ingoglia and the following transpired: Meli gave Peter $1,000 in cash to cover Lawrence's tax liability; Peter gave Meli a $5,000 check (in exchange for money furnished by Lawrence); and Meli· endorsed this check over to Beck. However, Beck demanded cash and, in compliance with such demand, Peter on December 16, 1963 made out a new check for $5,000 which he together with Meli cashed at a bank. Peter then gave the $5,000 in cash to Beck and in exchange Beck sent his $5,000 check to Lawrence Ingoglia. At about the same time, Beck drew up a statement, without date, addressed to ·himself. This statement was signed by Meli. It purported to absolve Beck of any wrongdoing and asserted, *inter alia*: (a) that in early September, 1963 Meli had asked Beck to accept a $5,000 check upon Meli's false representation that the check was in connection with Meli's prospective retention of Beck as attorney in "a matter" in which Meli was involved; (b) that Meli had caused Beck's receipted bill for the $5,000 to be made out without Beck's knowledge or consent; and (c) that Beck had given Meli the two $2,500 checks upon Meli's request and statement that they "would discuss the matter later." In June, 1965 Lawrence Ingoglia was called for questioning by the Nassau County Judicial Inquiry on Professional Conduct. Shortly thereafter, Peter Ingoglia procured from Meli a $5,000 promissory note, back-dated to December 16, 1963, to enable Peter, if also called for questioning, to use the note in support of the fictitious explanation he would offer about the $5,000 check which had been cashed in December, 1963 to undo Beck's involvement. As to Meli, the reporting Justice found: (1) that he had attempted to conceal the wrongful payment of $5,000 to himself by using Beck as a conduit; (2) that Meli later tried to conceal the transaction by signing a back-dated note with intent to mislead the Judicial Inquiry; (3) that he gave the Judicial Inquiry a false affidavit about the nature of his transaction with Lawrence Ingoglia; and (4) that he, Meli, gave perjured testimony at the hearings in these proceedings. As to Lawrence Ingoglia, the reporting Justice found: (1) that he too knowingly used Beck as a conduit for the improper payment to Meli of $5,000; (2) that his, Lawrence's, original closing statement as to the condemnation matter, filed with the Judicial Conference, which showed that Beck had performed legal services and received a fee for such services, was false; (3) that his, Lawrence's, amended closing statement, in which he attributed Beck's inclusion in the original statement to a secretary's error, was also false; and (4) that he, Lawrence, had refused to appear before the Judicial Inquiry

on June 7, 1965 and on June 21, 1965. As to Peter Ingoglia, the reporting Justice found: (1) that Peter, knowing of Lawrence's original wrongful payment to Meli, attempted to conceal that wrong by returning Lawrence's $5,000 to him through Meli and Beck; and (2) that Peter took the $5,000 promissory note from Meli in June, 1965 with intent to mislead the Judicial Inquiry and to conceal the wrongful payment to Meli, i.e., to create the false impression that Meli had borrowed $5,000 from him on the date of the note. As to Beck, the reporting Justice found that he was an innocent conduit for the $5,000 payment to Meli and that the charges that Beck (1) had received and paid out the $5,000 to conceal the wrongful payment; and (2) had induced Meli to sign the statement purporting to absolve Beck from wrongdoing, were not proved. We agree with the findings of the reporting Justice as to Meli and the Ingoglias. We disagree, however, with his findings as to Beck. We think there was ample evidence to sustain the charges against Beck. We deem the charges against him to have been fully established by the proof, and we so find. It is our opinion and we find that: (1) Beck's acceptance of Lawrence's $5,000 check in September, 1963, with an indorsement thereon stating falsely that it was in payment for legal services rendered by him, Beck; (2) his rendition and delivery of the false receipted bill for legal services he knew he had never performed; and (3) his transmittal of the two $2,500 checks to Meli, clearly indicate his, Beck's, guilty knowledge of the other three respondents' wrongful scheme to have the respondent Meli improperly share in a legal fee procured as the result of his disclosure of the confidential information in the County Attorney's file and in direct conflict with the duties of his position in the County Attorney's office. We also are of the opinion and we find that Beck's preparation of the statement purporting to absolve himself, clearly demonstrates his awareness of the illicit scheme, his original participation and acquiesence in it and his belated attempt to insulate himself from blame. Accordingly Beck's motion is denied and petitioner's motion as to each of the four respondents is granted. In our opinion, respondents Anthony J. Meli, Peter S. Ingoglia and Lawrence S. Ingoglia are unfit to continue as members of the Bar. They are disbarred and their names are ordered to be struck from the rolls of attorneys and counselors at law, effective upon the date of this decision, namely, September 9, 1968. As to Beck, however, his culpability is not of the same degree as that of the other respondents. While we find that Beck participated knowingly in this fraudulent scheme to permit Meli to obtain the $5,000, he was not a prime actor in the plan and, so far as the record discloses, received no pecuniary profit from it. We also take into consideration the evidence (noted in the Justice's report) that Beck co-operated with the Judicial Inquiry in its investigation. Nevertheless, his conduct does require some disciplinary action. Under all the circumstances, we conclude that his suspension from the practice of law for a period of one year is warranted. Accordingly, Beck is herewith suspended from the practice of law for a period of one year, commencing October 9, 1968. Rabin, Acting P. J., Hopkins, Benjamin and Munder, JJ., concur; Martuscello, J., concurs, except that he dissents from the disposition with respect to respondent Peter Ingoglia, and votes to suspend that respondent from the practice of law for a period of one year, on the ground that his culpability was more or less of the same degree as that of Beck and, therefore, he should not be given a greater penalty than that imposed upon Beck.